IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

UNITED STATES OF AMERICA,

    Plaintiff,

v.                                                                             Case No. 19-10103-JWB

EMANUEL E. GOINES, JR.,

    Defendant.

## MEMORANDUM AND ORDER

This case comes before the court on Defendant's motion to suppress (Doc. 23). The motion has been fully briefed (Docs. 35, 39) and the court held an evidentiary hearing on November 6, 2019. Defendant's motion is DENIED for the reasons herein.

    I.    **Facts and Procedural History**

On June 22, 2019, the Wichita Police Department was investigating a homicide that occurred around 6 p.m. in the evening. Several weapons were fired at the scene of the homicide. The weapon had not yet been recovered by the police. Through the homicide investigation, Wichita officers learned that Defendant Emanuel Goines was present at the scene of the homicide. Defendant was with Quantezz Butler on that evening. Both Defendant and Quantezz were known to the Wichita officers as gang members. Officers also learned that Quantezz had been in possession of a firearm at the scene of the homicide.

On June 25, officers continued to investigate the June 22 homicide. Based on the information learned in the investigation, a member of the Wichita Police Department issued a "felony pick-up order" for Quantezz. A felony pick-up order is not a warrant but appears to be a general authorization to arrest arising from a determination that officers had probable cause to

arrest Quantezz for the homicide based on information learned in the investigation.[1] Officers were also looking for Defendant so that they could interview him about the homicide. Officers had intended to ask Defendant if he would agree to go to the police station to be interviewed. Officer Jeremy Henry was involved in the homicide investigation and in the surveillance on June 25. Henry was driving a patrol vehicle on June 25 and riding with Officer Christopher Hornberger. Officer Jamie Thompson was also involved in the surveillance and operating undercover.

As a part of his duties, Henry utilizes social media as an investigative tool. Henry uses both Facebook and Snapchat. On his Snapchat account, Henry is friends with a user named "Pooh Hefner." Based on the profile information, the photographs on the account, and similar associates, Henry believes that "Pooh Hefner" is Defendant. Defendant is a comedian and also uses the name "Pooh Hefner" as a stage name.

As the officers were patrolling in Wichita, Henry was monitoring the "Pooh Hefner" Snapchat account. Henry viewed live videos that were posted to the account. Henry testified that the videos are limited, by the app, to ten seconds. In the first live video, it appeared that the user was at a funeral. At that time, there was a funeral occurring in Wichita for Freddy Trezvant, a known gang member. Henry also viewed another live video that showed four men in a vehicle. The video showed a driver dressed in black, a front passenger with what appeared to be a white t-shirt, a rear passenger with a Hawaiian shirt, and an individual who appeared to be Defendant. The individual who appeared to be Defendant was sitting in the rear passenger seat and wearing a white t-shirt that was made for the Trezvant funeral.

---

[1] The court need not determine the legitimacy of the felony pick-up order or whether the officers had probable cause to arrest Quantezz for murder because the car stop at issue herein was lawful based on other factors, as discussed later in this order.

Thompson was conducting surveillance at the funeral. Henry, Hornburger, and Thompson were in communication regarding the surveillance. Based on the information in the Snapchat video, Thompson was searching for a vehicle that had four younger men. Thompson observed a silver Chevy Trailblazer which appeared to have three or four young men. Thompson relayed the license plate information to Henry. One of the officers determined that the license plate was registered to Kenneth Butler, Sr., who was Quantezz' father. Quantezz also had a brother, Kenneth Jr. It was determined that Kenneth Jr. did not have a valid driver's license.

The officers planned on stopping the vehicle after they determined that the driver was either Quantezz or Kenneth. Based on a review of the Snapchat video and pictures of both Quantezz and Kenneth, the officers could not determine who was driving the Trailblazer.[2] The officers planned to initiate the car stop after the burial at the cemetery. The Trailblazer, however, did not go to the cemetery. While following the Trailblazer, Thompson observed the vehicle swerve several times over the center lane. After the Trailblazer did not go into the cemetery, the officers decided to stop the vehicle for the traffic violation of failing to maintain a single lane, which is a violation of both state and local law.

The patrol car activated its emergency lights to conduct the traffic stop. This initiated the video and audio recording in the police vehicle. The Trailblazer initially appeared to pull over in a parking lot but then sped off. The Trailblazer swerved in the parking lot and sped down the street. During the pursuit, the Trailblazer was speeding, almost crashing, cutting through private lots, and the passenger doors kept opening and closing. During the pursuit, Hornburger can be heard on the audio reciting traffic violations as they occurred.

---

[2] From the officers' perspective, this inability to determine the identity of the driver was immaterial. If Quantezz was driving, they believed they had authority to stop and arrest him on the felony pick-up order; and if Kenneth Jr. was driving, they had probable cause to stop the vehicle because he did not possess a valid driver's license.

In the 4100 block of East Vesta, a car door on the passenger side opened and something was thrown out of the Trailblazer. Shortly thereafter, an individual jumped out of the Trailblazer. Hornburger thought that it was the individual in the rear passenger seat, who the officers believed to be Defendant. Hornburger then pursued that individual on foot. Thompson was also pursuing the Trailblazer and was able to maneuver her vehicle around the block and intercept the suspect who fled on foot. That individual turned out to be Kevin Johnson, not Defendant. In the meantime, the Trailblazer continued to flee from Henry. During that short time, Hornburger questioned Johnson regarding the individuals who remained in the Trailblazer and asked if there were any weapons in the vehicle. In response to the question regarding weapons, Johnson stated that there might be "a thing" or "something" in the car, which Hornburger understood as street slang for a weapon. Based on Johnson's responses, Hornburger believed that there was a weapon in the Trailblazer. Hornburger then notified the other officers of this information over the radio. A short time later, both the rear passengers jumped out of the Trailblazer. The individual wearing the Hawaiian shirt went to the west. The individual in the white shirt went east. The officers believed that this last person was Defendant. As he was running from the vehicle and into the neighborhood, Henry observed that the individual believed to be Defendant was holding his left arm close to his body while his right arm was swinging. Henry testified that this asymmetrical swing of the arms while running is indicative of someone who is armed. He observed the individual believed to be Defendant go east behind 1528 N Belmont. Henry then continued to pursue the Trailblazer.

Thompson heard over the dispatch channel that the individuals seated in the rear had jumped out of the Trailblazer. She drove south on Broadview, which is one block away from Belmont. Thompson saw an individual matching the suspect's description walking in a hurried manner. Thompson recognized the individual as Defendant. Thompson ordered Defendant to the

ground and testified that he was detained because he had fled from the officers while they were attempting to conduct a car stop. Defendant was placed in handcuffs after several additional officers arrived. Defendant was taken to the police department by Officer Tapia where he was interviewed by police. During the interview, Defendant waived his *Miranda* rights and made a statement.

That same day, officers remaining on the scene recovered a handgun from the backyard of 1528 N Belmont. On July 16, 2019, Defendant was indicted pursuant to 18 U.S.C. § 922(g)(1). (Doc. 1.) The indictment contains one count of felon in possession of a firearm. Defendant has moved to suppress his statements that he made while in custody on the basis that his arrest lacked probable cause.[3]

**II.   Analysis**

The Fourth Amendment to the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." U.S. Const. amend. IV. An arrest by law enforcement without a warrant is reasonable under the Fourth Amendment where there "is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). It is well settled that "if an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001). "[E]vidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search or seizure." *United States v. Calandra*, 414 U.S. 338, 347 (1974).

---

[3] Defendant's motion to suppress also sought to suppress statements made on the scene. The government, however, stated at the hearing that it did not intend to offer those statements at trial.

5

There is no dispute that officers did not have a warrant to arrest Defendant. Therefore, the only issue is whether officers had probable cause to arrest Defendant for a crime. "Probable cause to arrest exists where, under the totality of the circumstances, a reasonable person would believe that an offense has been committed by the person arrested." *United States v. Martin*, 613 F.3d 1295, 1302 (10th Cir. 2010) (internal quotation marks omitted). This is an objective inquiry. *Apodaca v. City of Albuquerque*, 443 F.3d 1286, 1289 (10th Cir. 2006). "An arrest is not invalid under the Fourth Amendment simply because the police officer subjectively intended to base the arrest on an offense for which probable cause is lacking, so long as 'the circumstances, viewed objectively, justify' the arrest." *Id.* (quoting *Devenpeck v. Alford*, 543 U.S. 146, 153 (2004)). Therefore, the question before the court is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." *Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002) (internal quotation marks and alterations omitted).

Based on the testimony from the officers, a homicide had occurred on June 22, 2019. Officers had learned that Defendant had been on the scene of that homicide with Quantezz. Officers had information that Quantezz was armed on the evening of the homicide and was a suspect in the homicide. On June 25, Defendant was seen in a video posted to Snapchat. That video showed Defendant in the rear seat of a vehicle. Based on the surveillance, the vehicle, a Trailblazer, was determined to be registered to Quantezz' father. The officers reasonably believed that either Quantezz or Kenneth Jr. was driving the Trailblazer and that Defendant was in the rear seat. The Trailblazer was observed failing to maintain a single lane.

The Trailblazer was then followed by the officers. After trying to conduct a traffic stop, the Trailblazer failed to stop. The Trailblazer then committed traffic infractions while fleeing from

the officers. The front passenger fled the vehicle and was detained. Officers determined that individual was Kevin Johnson and not Defendant. That information was relayed to the officers. The rear passenger then fled the Trailblazer and ran behind the residence of 1528 N. Belmont. The right, rear passenger was not chased at that time because Henry continued to pursue the Trailblazer. Thompson arrived in the area within a couple of minutes and spotted Defendant walking hurriedly. Defendant matched the description of the individual who was in the Snapchat video. Thompson recognized Defendant and detained him for interfering with law enforcement.

Based on the evidence presented at the hearing, the officers had reason to initiate the traffic stop as Thompson had observed a traffic infraction. *See* K.S.A. § 8–1522(a) (duty to maintain a single lane). There was also probable cause to believe that the driver violated K.S.A. § 8-1568, flee and elude, because the driver failed to stop after the officers initiated a stop and activated the emergency lights. Therefore, the officers were lawfully attempting to stop the vehicle prior to Defendant's arrest.

The court further finds that the officers had reason to believe that Defendant was the right, rear passenger and that Defendant had fled the Trailblazer during a traffic stop. Although Defendant argues that he was not the individual in the right, rear passenger seat, the evidence before the court at this time shows that the officers had an objectively reasonable belief that he was the right, rear seat passenger. Defendant contends that even if he was the right, rear passenger the officers did not have probable cause to believe that he had committed a crime as he was not driving the vehicle. The government asserts that the officers had probable cause to believe that Defendant had interfered with law enforcement in violation of K.S.A. § 21-5904. The relevant portion of the statute is as follows:

> (a) Interference with law enforcement is: … (3) knowingly obstructing, resisting or opposing any person authorized by law to serve process in the service or

7

execution or in the attempt to serve or execute any writ, warrant, process or order of a court, or in the discharge of any official duty.

K.S.A. § 21-5904.

Under the statute, interference is a felony if it occurs in the case of a felony. *Id.; see State of Kansas v. Heard*, 313 P.3d 105, 2013 WL 6063149 (Kan. Ct. App. Nov. 15, 2013). The fleeing and eluding statute provides that it is a misdemeanor unless the driver

> (1) Commits any of the following during a police pursuit: (A) Fails to stop for a police road block; (B) drives around tire deflating devices placed by a police officer; (C) engages in reckless driving as defined by K.S.A. 8-1566, and amendments thereto; (D) is involved in any motor vehicle accident or intentionally causes damage to property; or (E) commits five or more moving violations; or
> (2) is attempting to elude capture for the commission of any felony, shall be guilty as provided in subsection (c)(2).

K.S.A. § 8-1568(b). During the hearing, the officers did not testify as to whether the crime of fleeing and eluding would have classified as a felony or a misdemeanor. Although, upon reviewing the video, it appears that Kenneth Jr. may have been in violation of K.S.A. § 8-1566, reckless driving, and/or that Kenneth Jr. committed five or more moving violations during the chase, the court will presume that the crime of fleeing and eluding committed by the driver was a misdemeanor. Under Kansas law, an officer may arrest an individual for committing a crime, except for traffic infractions or a cigarette infraction, in the presence of an officer. K.S.A. § 22-2401.

Defendant argues that the officers did not have probable cause to arrest him for interference with law enforcement because the "law enforcement duties being interfered with are being committed by the driver; and the passengers being allowed to flee did nothing to interfere in the police efforts to effectuate their duty to apprehend the driver." (Doc. 39 at 6.) Defendant, however, does not cite any authority for the proposition that a passenger who flees a car stop is not interfering with law enforcement.

The Kansas Court of Appeals has discussed the applicability of K.S.A. § 21-5904(a)(3) to a passenger who is in a vehicle that is fleeing from a car stop. *See Heard*, *supra*. In *Heard*, the district court had dismissed the criminal charges after noting that the defendant was not the driver, only a passenger, and had not committed any traffic offenses. *Id.* at *6. The court of appeals reversed, finding that the officers had probable cause to arrest for obstructing an investigation of the crime of eluding a police officer. *Id.* at *7. In that case, the police had been chasing the vehicle for a significant period of time. The driver had been driving at excessive speed during the chase. The court of appeals discussed its reasoning as follows:

> It is hard to believe after the events of those early morning hours that Heard did not know he was being pursued. When Heard immediately fled the scene, rather than remain—as one would expect of an innocent passenger, any reasonable officer's suspicions would be aroused. [The officer] certainly had a reasonable and articulable suspicion that Heard was intentionally obstructing his investigation of the crime of felony eluding a law enforcement officer.
>
> We find this evidence is "sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt." *See Brockert*, 257 Kan. at 492. Accordingly, it was error for the district to dismiss the case prior to trial. Therefore, we reverse the district court's decision to dismiss the complaint against Heard and remand for further proceedings.

*Id.*[4]

In this case, the officers were lawfully attempting to stop the driver for, at a minimum, misdemeanor fleeing and eluding. The officers had reason to believe that Defendant was the right,

---

[4] Earlier in the opinion, the court of appeals cites to the *Brockert* case for the probable cause standard. *See Heard*, 2013 WL 6063149 *5. The probable cause standard under Kansas law, in its entirety, is as follows:

> In order to prove probable cause, there must be evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt. *State v. Green*, 237 Kan. 146, Syl. ¶ 3, 697 P.2d 1305 (1985). The term "probable cause" is defined to mean a reasonable ground of suspicion, supported by circumstances sufficiently strong in themselves to warrant a cautious person to believe that the accused is guilty of the offense with which he or she is charged. *State v. Howland*, 153 Kan. 352, Syl. ¶ 4, 110 P.2d 801 (1941).

*State of Kansas v. Bockert*, 257 Kan. 488, 492, 893 P.2d 832, 835 (1995). This standard is similar to the probable cause standard under federal law. Any arguable differences are not material as this court has determined that the officers had probable cause, under the standards set forth by the United States Supreme Court, to arrest Defendant.

rear passenger in the Trailblazer. Henry observed that passenger bail out of the Trailblazer and run behind a residence. Although Henry could not give chase, he radioed the right, rear passenger's actions in bailing from the Trailblazer. Mere minutes later, Thompson located Defendant a short distance away, wearing the clothes that matched the description of the fleeing suspect, and walking hurriedly. Thompson detained Defendant for interference with law enforcement. Defendant was then transported to the police department by Tapia. Based on the facts known to the officers[5], the court finds that the officers had probable cause to believe that Defendant had obstructed the officers' investigation of the crime of fleeing and eluding. *Heard*, 2013 WL 6063149 at *7. Defendant's arguments that his actions did not impede or obstruct the investigation do not go to the probable cause determination. The probable cause inquiry merely asks if the officers had an objective basis to believe that Defendant had committed the crime. The court finds that they did.

As Defendant's arrest was based on probable cause, any voluntary statements made thereafter are admissible.

**III.    Conclusion**

Defendant's motion to suppress (Doc. 23) is DENIED.

IT IS SO ORDERED this 14th day of November 2019.

                                              ___s/ John W. Broomes_____
                                              JOHN W. BROOMES
                                              UNITED STATES DISTRICT JUDGE

---

[5] Officers may rely on information relayed by other officers to establish probable cause under the "collective knowledge" doctrine. *See United States v. Chavez*, 534 F.3d 1338, 1345 (10th Cir. 2008). An officer may also conduct an arrest based on an instruction from another officer who has probable cause. *See id.* at 1347 (citing *United States v. Burton*, 288 F.3d 91, 99 (3d Cir. 2002) ("[T]he arresting officer need not possess an encyclopedic knowledge of the facts supporting probable cause, but can instead rely on an instruction to arrest delivered by other officers possessing probable cause.")